FARMERS RESERVOIR AND IRRIGA-
TION COMPANY; Farmers High Line
Canal and Reservoir Company; and City
of Westminster, Opposers/Appellants,

v.

CONSOLIDATED MUTUAL WATER
COMPANY; Agricultural Ditch and
Reservoir Company; and City of Golden,
Applicant/Appellees.

No. 00SA229.

Supreme Court of Colorado,
En Banc.

Oct. 15, 2001.

A Modified on Denial of Rehearing
Nov. 13, 2001.

John P. Akolt, Denver, CO, Attorney for Opposers/Appellant Farmers Reservoir and Irrigation Company.

Gaunt, Dirrim, Coover & Steele, P.C., Brice Steele, Brighton, CO, Attorney for Opposers/Appellant Farmers High Line Canal and Reservoir Company.

Carlson, Hammond & Paddock, L.L.C., Mary Mead Hammond, Lee H. Johnson, Denver, CO, Attorneys for Opposers/Appellant City of Westminster.

Benjamin L. Craig, Lakewood, CO, Attorney for Applicant/Appellee Consolidated Mutual Water Company.

Harvey W. Curtis & Associates, Harvey W. Curtis, Denver, CO, Attorney for Applicant/Appellee Consolidated Mutual Water Company.

Petrock & Fendel, P.C., Frederick A. Fendel, III, Denver, CO, Attorney for Objector/Appellee The Agricultural Ditch and Reservoir Company.

Porzak Browning & Bushong LLP, Glenn E. Porzak, Steven J. Bushong, Boulder, CO, Attorneys for Objector/Appellee City of Golden Office of the Attorney General.

Ken Salazar, Attorney General, Barbara McDonnell, Chief Deputy Attorney General, Alan J. Gilbert, Solicitor General, Joseph C. Smith, Jr., Deputy Attorney General, Lee E. Miller, First Assistant Attorney General, Steven O. Sims, Assistant Attorney General, Natural Resources Section, Denver, CO, Attorneys for the Division Engineer for Water Division 1.

Justice HOBBS delivered the Opinion of the Court.

This appeal is from the order of the District Court for Water Division No. 1 (Water Court) denying the petition of Farmers Reservoir and Irrigation Company; Farmers High Line Canal and Reservoir Company; and the cities of Westminster, Arvada, and Thornton (Opposers) seeking to invoke the retained jurisdiction provision of a change of water rights decree or, in the alternative, to extend the period of retained jurisdiction.[1] We hold that the Water Court did not err in refusing to invoke the retained jurisdiction provision of the judgment and decree in this case or, alternatively, to extend the period of retained jurisdiction. The historic consumptive use determinations the Water Court made in this case may not be reviewed under the retained jurisdiction provision.

## I.

This case involves two important but potentially conflicting purposes of the General Assembly in adopting section 37–92–304(6) governing judgments and decrees in change of water right and plan for augmentation cases: (1) the finality of Water Court determinations of historic beneficial consumptive use; and (2) the exercise of the retained jurisdiction provision to address injury to other water rights that results from placing the change of water right or augmentation plan into operation.

The Water Court's 1993 judgment and decree in this case adjudicated a change of water rights to Consolidated Mutual Water Company (Consolidated Mutual) for its ownership interest in rights to water historically utilized under the Lee, Stewart & Eskins Ditch (LSE Ditch), which diverts from Clear Creek under five different priorities. In the case now before us, Golden appeared to oppose Consolidated Mutual's application. The Water Court found that to allocate Consolidated Mutual's share of consumptive use, it had to determine an allocation for the City of Golden's share of consumptive use for two transfers it made of Priority 12 water from the LSE Ditch to the Church Ditch in the 1960s (Golden's 60s transfers). In doing so, it allocated 287 acre-feet annually to Golden's 60s transfers out of a total ditch-wide annual historic consumptive use of 1,144 acre-feet. In making these determinations, the Water Court relied on the testimony of Golden's expert, Gary Thompson. We adhere to our discussion in *Farmers High Line Canal & Reservoir Co. v. City of Golden*, 975 P.2d 189, 195 (Colo.1999) regarding Thompson's consumptive use calculations and the Water Court's reliance on them:

The water court stated that, "in figuring out [Con Mutual's entitlement to Priority 12 water], we have to figure out what Golden got" as a result of the 60s change proceedings. In furtherance of this goal, Golden's expert water engineer, Gary Thompson, prepared a table demonstrating the historical consumptive use of Priority 12 water. In doing so, Thompson relied on the notebooks and calculations that W.W. Wheeler had prepared for the 1960s proceedings. This table fixed the average total annual consumptive use of Priority 12 water at 411 acre-feet. Thompson testified that Con Mutual's share of Priority 12 water could be calculated by subtracting the acre-footage of water transferred to Golden in the 60s proceedings. Based on his calculations, Thompson concluded that Con Mutual was entitled to consume an average of 124 acre-feet of water per year. By implication, Thompson's analysis fixed Golden's share of Priority 12 at an average of 287 acre-feet per year, i.e., 411 acre-feet minus 124 acre-feet. Thompson has subsequently reiterated that his calculations in the Con Mutual case were computed by taking the total amount of historical consumptive use attributable to Priority 12 and "subtract[ing] what Golden's share was."

In the 1993 litigation, the water court agreed with Thompson's calculations and

**1.** Opposers appealed three issues: (1) "The Appellant's Verified Petition to Invoke Retained Jurisdiction established a showing of injury. Given this, [whether] the Water Court err[ed] in refusing to reconsider its change decree"; (2) "Whether the Water Court erred in requiring 'changed circumstances' and 'unanticipated injury' as pre-requisites for invoking retained jurisdiction"; and (3) "The law permits extension of retained jurisdiction when the absence of injury has not been conclusively established. [Whether] the Water Court err[ed] in refusing to extend the period of retained jurisdiction."

held that a volumetric limitation on Con Mutual's decree was necessary in order to prevent injury to Golden and other users. In its corresponding order, the court adopted the calculations presented by Thompson in his testimony.

*Farmers High Line Canal & Reservoir Co.*, 975 P.2d at 195 (footnote omitted).

Invoking the doctrine of issue preclusion, Opposers sought in *Farmers High Line Canal & Reservoir Co.* to impose upon Golden's 60s decrees, by way of limitation, the volumetric allocation the Water Court adopted in the case before us based on Thompson's calculations. Due to claim preclusion, we refused to imply such a volumetric limitation into Golden's 60s decrees. *See Farmers High Line Canal & Reservoir Co.*, 975 P.2d at 201–02.

Because both of these cases involve priorities historically utilized under the LSE Ditch, we briefly summarize the status of those appropriations and the litigation concerning them.

On October 4, 1884, the District Court of Arapahoe County adjudicated Clear Creek water rights with an appropriation date of May 13, 1861, for diversion of 9.9 c.f.s. by means of the Claus and Couch Ditch (Priority 12 Water Rights). By decree of June 10, 1908, successors in interest to a portion of the Priority 12 water then transferred 8.6 c.f.s. from the Claus and Couch Ditch to the LSE Ditch. Priority 12 water was applied to lands of Priority 12 owners and other lands irrigated by means of the LSE Ditch. The LSE Ditch also diverted water under four other priorities on Clear Creek designated in prior adjudications as Priority Numbers 27, 51, 53, and 56 (LSE Junior Rights).[2] The LSE Ditch diverts water at a point on the south bank of Clear Creek on what is now Coors Brewing Company property in Golden. The LSE Ditch historically irrigated 891 acres of land.

Consolidated Mutual is a non-profit corporation providing domestic and municipal water service in the northwest Denver metropolitan area. Its service area comprises approximately twenty-seven and one-quarter square miles divided into two major water supply areas. The western supply area is served by water from the LSE Ditch, and the eastern portion by water supplied by the Denver Water Department. In the 1960s, Consolidated Mutual obtained 2.5855 c.f.s. of the 8.6 c.f.s. Priority 12 water that was being diverted through the LSE Ditch. It also obtained 41% of the LSE Junior Rights. Consolidated Mutual did not apply for a change from irrigation use until 1991, although it began to use the water for domestic and municipal purposes in the 1960s.

In 1991, Farmers Reservoir and Irrigation Company filed a complaint in the Water Court alleging that Consolidated Mutual had expanded its use of Priority 12 Water Rights by impermissibly making winter diversions. The Water Court dismissed the complaint, but required Consolidated Mutual to file an application for change of its water rights. Consolidated Mutual filed a change application with the Water Court on August 29, 1991 for its share of the five priorities.

After hearing several expert witnesses and considering the documentary exhibits, the Water Court adopted Thompson's analysis. Thompson assigned an allocation of 287 acre-feet annually from the ditch-wide consumptive use total to Golden's 60s transfers. He testified that this amount was consistent with the consumptive use allocations that Golden's expert, W.W. Wheeler, had assumed for Golden's 60s transfers at the time they were decreed. Thompson than calculated that Consolidated Mutual's Priority 12 Water Rights ownership entitled it to 124 acre-feet of consumptive use annually and its LSE Junior Rights ownership entitled it to 302 acre-feet annually, for a total of 426 acre-feet of consumptive use out of a total ditch-wide consumptive use of 1,144 acre-feet annually. In addition to apportioning Priority 12 water to lands owned by the 1908 transferors and their successors, Thompson also apportioned Priority 12 water to lands that had been irrigated only by the LSE Junior Rights prior to the 1908 transfer of Priority 12 Rights into the LSE Ditch.

---

**2.** Priority 27, April 17, 1863, 2.18 c.f.s.; Priority 51, February 23, 1868, 4.30 c.f.s.; Priority 53, May 31, 1869, 9.77 c.f.s.; and Priority 56, April 13, 1871, 6.94 c.f.s.

Thompson described operation of the five priorities under the LSE Ditch as "a mutual ditch or de facto sort of mutual ditch," and he summarized the results of his consumptive use analysis in the following table:

| CONSUMPTIVE USE | | |
| --- | --- | --- |
| | CON MUTUAL (ACRE–FEET) | DITCHWIDE (ACRE–FEET) |
| Priority No. 12 | 124 | 411 [3] |
| LSE Rights | 302 | 733 |
| Total | 426 | 1,144 |

Having accepted Thompson's historic consumptive use analysis, the Water Court then proceeded to make consumptive use allocations to Golden and Consolidated Mutual and fashioned protective conditions for Consolidated Mutual's use of water derived from exercise of the five priorities. The Water Court imposed seasonal volumetric limitations on deliveries to Consolidated Mutual, restricted Consolidated Mutual to one use of the water, and provided for discharge of return flows from that use through the Denver Metropolitan Wastewater Treatment Plant into the South Platte River. Under the 1993 judgment and decree, Consolidated Mutual would receive 239 acre-feet of annual deliveries for its Priority 12 ownership during the irrigation season of May through October and no more than 1,910 acre-feet in any consecutive ten-year period. For its ownership of LSE Ditch Junior Rights, Consolidated Mutual would receive 581 acre-feet of deliveries from May through October and 45 acre-feet of deliveries from November through April, for a total of 626 acre-feet of deliveries during each annual period, further limited to a total of 5,100 acre-feet of deliveries for each ten-year period. The judgment and decree contained a five-year retained jurisdiction provision and also provided that:

The Court has adopted a ditch-wide method of analysis for the water rights that are the subject of this proceeding, because that method is both appropriate and consistent with the method used in previous transfers from this ditch, particularly those transfers made by the City of Golden. *Any future transfers should be based on the same method of analysis to prevent injury to vested water rights.*

(Emphasis added.) There was no appeal of the Water Court's findings, judgment, and decree.

On September 29, 1995, Farmers High Line Canal and Reservoir Company; Farmers Reservoir and Irrigation Company; and the Cities of Westminster, Thornton, and Arvada filed a complaint in Water Court alleging that Golden's use of its 60s change decrees infringed on their water rights. Among other contentions, they argued that the 1960s change decrees contained implied volumetric consumptive use limitations and that Golden was consuming a greater volume of water than permissible.

After denying Golden's motion to dismiss, the Water Court concluded in its 1997 order that the decrees for Golden's 60s transfers were not subject to implied volumetric limitations, because the earlier proceedings had considered historic consumptive use and had included conditions to prevent injury to other water rights that were not subject to collateral attack.[4] We agreed with the Water Court that claim preclusion prohibited imposition of volumetric limits into the 60s change decrees. *See Farmers High Line Canal & Reservoir Co.,* 975 P.2d at 201–02.

In 1998, Opposers filed petitions under section 37–92–304(6) requesting the Water Court to extend or invoke the period of retained jurisdiction in this case pending our decision in *Farmers High Line Canal & Reservoir Co.* If we determined that Golden's 60s decrees were subject to volumetric limitations—so Opposers argued—then operation

---

3. Golden's share of priority 12 consumptive use, 287 acre-feet, is included in this figure.

4. The Water Court held that our decision in *Orr v. Arapahoe Water & Sanitation District*, 753 P.2d 1217, 1226 (Colo.1988), mandated implication of volumetric consumptive use limits in existing decrees when the matter of historic consumptive use had not been previously adjudicated. *See Farmers High Line Canal & Reservoir Co.,* 975 P.2d at 197.

of the Consolidated Mutual change decree would not result in injury to their water rights. Opposers further contended that if Golden's 60s decrees were not so limited, and if Golden were to make a greater consumptive use of its Priority 12 water than allocated to it in this case, then the Water Court had to invoke its retained jurisdiction to limit additional changes of water rights, including those of Consolidated Mutual, so that total consumption under the five priorities did not exceed the total annual consumptive use allocated to their historic use.

Upon review of Opposers' petitions, the Water Court refused to exercise retained jurisdiction or extend the period during which it might exercise retained jurisdiction in this case. The Water Court reasoned that our decision in *Farmers High Line Canal & Reservoir Co.* and "Golden's continuing claim to the 4.66 AF, which it obtained in the 60's decrees is neither a changed circumstance, nor an unanticipated one." The Water Court concluded that the retained jurisdiction provision of section 37–92–304(6) addresses "changed circumstance or unanticipated injury."

We affirm the Water Court's order denying Opposers' motions to invoke or extend retained jurisdiction, but we do so on different grounds.

## II.

We hold that the Water Judge did not err in refusing to reopen the historic consumptive use determinations it made in this case or, in the alternative, refusing to extend the period of retained jurisdiction pending resolution of future change applications involving LSE Ditch water. The gravamen of Opposers' pleading is that Golden's alleged overdraft of its consumptive use allocation should be addressed by revising Consolidated Mutual's consumptive use downward. However, historic consumptive use determinations are not susceptible to redetermination under the retained jurisdiction provision.

Our analysis proceeds in two parts. First, we construe section 37–92–304(6), which provides for the appealability of all findings, judgments, and decrees, yet requires the inclusion of a retained jurisdiction period in all change of water right and augmentation plan decrees. Based on this analysis, we determine that the General Assembly through section 37–92–304(6):(1) intended to preclude review of consumptive use determinations the Water Court made upon entry of the judgment and decree, except through taking an appeal; and (2) intended the retained jurisdiction provision to address injurious effects that result from placing the change of water right or augmentation plan into operation.

Second, we analyze the Water Judge's order and determine that the Water Judge did not abuse his discretion in refusing to reopen the allocation of Consolidated Mutual's consumptive use. The injury that Opposers allege stems from the fact that Golden's 60s decrees were not volumetrically limited. The remedy they seek is to cut back the proportionate share of consumptive use the Water Court allocated to Consolidated Mutual based upon its ownership interest in the five priorities historically utilized under the LSE Ditch. However, because Opposers took no appeal, the consumptive use determinations the Water Court made in this case became non-reviewable and apply to future change cases involving the five appropriations historically utilized under the LSE Ditch. *See Santa Fe Trail Ranches Prop. Owners Ass'n v. Simpson*, 990 P.2d 46, 55 (Colo.1999); *Williams v. Midway Ranches Prop. Owners Ass'n, Inc.*, 938 P.2d 515, 521–22 (Colo.1997).

### A. Retained Jurisdiction

When construing a statute, we ascertain and give effect to the General Assembly's intent based upon the plain meaning of the statute's language, utilizing legislative history when necessary to aid the resolution of statutory ambiguities. *See Park County Sportsmen's Ranch v. Bargas*, 986 P.2d 262, 268 (Colo.1999). We construe statutory provisions as a whole, giving effect and meaning to every word and harmonizing potentially conflicting provisions, if possible. *See Bd. of County Comm'rs v. Vail Assocs.*, 19 P.3d 1263, 1273 (Colo.2001).

Section 37–92–304(6) provides:

Any decision of the water judge as specified in subsection (5) of this section dealing

with a change of water right or a plan for augmentation shall include the condition that the approval of such change or plan shall be *subject to reconsideration by the water judge on the question of injury to the vested rights of others for such period after the entry of such decision as is necessary or desirable to preclude or remedy any such injury.* Such condition setting forth the period allowed for reconsideration *shall be determined by the water judge after making specific findings and conclusions including, when applicable, the historic use to which the water rights involved were put, if any, and the proposed future use of the water rights involved.* The water judge shall specify his determination as to such period in his decision, but the period may be extended upon further decision by the water judge that the nonoccurrence of injury shall not have been conclusively established. Any decision may contain any other provision which the water judge deems proper in determining the rights and interests of the persons involved. *All decisions of the water judge, including decisions as to the period of reconsideration and extension thereof, shall become a judgment and decree as specified in this article and be appealable upon entry, notwithstanding conditions subjecting the decisions to reconsideration on the question of injury to the vested rights of others as provided in this subsection (6).*

§ 37–92–304(6), 10 C.R.S. (2001)(emphasis added).

The underscored provisions plainly grant the Water Court discretion to set the period of retained jurisdiction, to extend it, and to invoke it as appropriate. We review the Water Court's order under an abuse of discretion standard. *Aspen Wilderness Workshop v. Hines Highlands Ltd. P'ship*, 929 P.2d 718, 726 (Colo.1996). The length of the retained jurisdiction period is what the Water Judge finds to be "necessary or desirable to preclude or remedy such injury" based on the evidence. § 37–92–304(6), 10 C.R.S. (2001). Thereafter, the Water Judge "may" extend the period of retained jurisdiction "upon further decision" that the "nonoccurrence of injury shall not have been conclusively established." *Id.* However, section

304(6) also provides that a judgment and decree are "appealable upon entry, notwithstanding conditions subjecting the decisions to reconsideration on the question of injury to the vested rights of others as provided in this subsection (6)." *Id.*

Thus, the language of the statute raises an ambiguity as to whether a non-appealed finding of the applicant's consumptive use entitlement is subject to review by means of the retained jurisdiction provision of the judgment and decree on a question of injury occasioned by another owner utilizing more than its allocated share of historic consumptive use. To resolve this ambiguity, we proceed with a legislative history analysis of section 37–92–304(6). We discuss the role of augmentation plans and changes of water rights under Colorado law, examine the original statutory provision and amendments in light of this role, and consult transcripts of General Assembly hearings the parties have provided for this purpose.

### 1. Changes of Water Rights and Augmentation Plans

Scarcity and value of the water resource has always driven Colorado water law; accordingly, the state's policy is to efficiently manage, administer, and optimize water use for operation of as many decreed uses as there is available supply. Provisions of the Water Resources Determination and Administration Act of 1969 (1969 Act) for adjudication of water rights changes, exchanges, and augmentation plans allow newer uses of water, such as municipal and recreational uses, to come into being and operate consistent with the administration of decreed water rights. See *Midway Ranches*, 938 P.2d at 521–22; Sherry A. Caloia et al., *The Water Rights Determination and Administration Act of 1969: A Western Slope Perspective on the First Thirty Years*, 3 U. Denv. Water L.Rev. 39, 45–47 (1999).

When unappropriated water is unavailable, augmentation plans permit junior water right holders to divert water out-of-priority while ensuring the protection of senior water rights. *See Danielson v. Castle Meadows, Inc.*, 791 P.2d 1106, 1112 (Colo. 1990); David F. Jankowski et al., *The 1969 Act's Contributions to Local Governmental Water Suppliers*, 3 U. Denv. Water L.Rev.

20, 27 (1999). This is typically accomplished by providing an augmented water supply necessary to offset the out-of-priority diverters' depletions, so that holders of decreed water rights in their order of priority can enjoy the quantity of supply that would be available to them absent those depletions. *See* § 37–92–305(5) & (8), 10 C.R.S. (2001). As the source of water dedicated to replacing depletions to water rights, augmentation plans often include use of consumptive use water allocations adjudicated through change proceedings. *See Midway Ranches*, 938 P.2d at 522. Through application and adjudication, the point of diversion, type, manner, and/or place of use of a water right may be changed. *See* §§ 37–92–103(5), –302, –305(3) & (4), 10 C.R.S. (2001). Changes of water rights are limited in quantity and time by historic use. *See Weibert v. Rothe Bros.*, 200 Colo. 310, 316–17, 618 P.2d 1367, 1371–72 (1980) (discussing prior cases and summarizing change of water right law). The decreed change of water right provides its owner the advantage of being able to exercise the priority previously adjudicated to the appropriation. *See Santa Fe Trail Ranches*, 990 P.2d at 55.

▪ Over an extended period of time, a pattern of historic diversions and use under the decreed right for its decreed use at its place of use will mature and become the measure of the water right for change purposes, typically quantified in acre-feet of water consumed. *See Midway Ranches*, 938 P.2d at 521. Essential functions of change of water right proceedings are to: (1) identify the original appropriation's historic beneficial use; (2) fix the historic beneficial consumptive use attributable to the appropriation by employing a suitable parcel-by-parcel or ditch-wide methodology; (3) determine the amount of beneficial consumptive use attributable to the applicant's ownership interest; and (4) affix protective conditions for preventing injury to other water rights in operation of the judgment and decree. *See Santa Fe Trail Ranches*, 990 P.2d at 54–55. Under a ditch-wide methodology, each owner's consumptive use allocation depends upon its percentage ownership of the total historic consumptive use allocated to the ditch water rights. Once the Water Court has adopted a methodology for determining an appropriation's historic beneficial consumptive use and has made allocations of consumptive use based thereon, that methodology and those allocations are normally expected to govern future change proceedings involving the same water right. *See Midway Ranches*, 938 P.2d at 526.

A classic form of injury involves diminution of the available water supply that a water rights holder would otherwise enjoy at the time and place and in the amount of demand for beneficial use under the holder's decreed water right operating in priority. Typical protective conditions may include measures requiring dry-up of historically irrigated lands, maintenance of return flow patterns, gauging, monitoring, and accounting of diversions and deliveries. Water courts design these provisions in order to hold the owners of water rights to their adjudicated allocation of historic beneficial consumptive use and assure maintenance of surface or tributary groundwater stream conditions that existed at the time of other water rights appropriations. *See, e.g., City of Thornton v. Bijou Irrigation Co.*, 926 P.2d 1, 80, 87 (Colo.1996).

▪ Water engineers play an important role in change of water right and augmentation plan proceedings. When serving as expert witnesses, their tasks typically include establishing: (1) the historic beneficial consumptive use of the appropriations at issue; and (2) the protective conditions that will maintain the conditions of the stream upon which decreed water rights depend in order to prevent injury. *See* Daniel S. Young & Duane D. Helton, *Developing a Water Supply in Colorado: The Role of an Engineer*, 3 U. Denv. Water L.Rev. 373, 382–88 (2000). The first function applies to the Water Court's role in determining the measure of the appropriation proposed for change, a question of evidentiary historical fact.[5] The second function applies to the Water Court's role in ascertaining the timing and delivery

---

5. For an agricultural appropriation, this analysis focuses on the lands historically irrigated and utilizes diversion records, water application practices, soil and crop types, diversion and delivery efficiency, precipitation, temperature, growing season, aerial records, and testimony of irrigators, along with other reliable and relevant evidence of the appropriation's historic beneficial consumptive use over a representative time period. *See* Young & Helton, *supra*, at 379–80, 384–85.

of return flows and/or substitute water necessary to supply other water rights with the quantity of water they would otherwise enjoy absent the change of water right or augmentation plan. This question involves predictions of future injury and the measures that will likely prevent it.[6]

■ As we explain below, our construction of section 37–92–304(6) is that the General Assembly intended the retained jurisdiction provision to apply to the Water Court's role in predicting future injurious effect and the measures likely to prevent injury, not to the Water Court's fact-finding role in determining the appropriation's historic use and its matured measure, and then allocating to owners their beneficial consumptive use shares.

### 2. The 1969 Act and Amendments

When initially adopted as part of the 1969 Act, section 37–92–304(6) allowed—but did not require—the water judge to include a two-year period for reconsidering the question of injury to the vested water rights of others in a water rights change or augmentation judgment and decree. *See* ch. 373, § 148–21–20(6), 1969 Colo. Sess. Laws 1210.

The 1977 amendment to section 304(6) required the inclusion of a retained jurisdiction provision in augmentation plan judgments and decrees but also allowed the water judge to determine the period of retained jurisdiction and to extend the period of retained jurisdiction. Ch. 483, sec. 1, § 37–92–304(6), 1977 Colo. Sess. Laws 1702, 1703. The 1977 amendment also provided that the period of retained jurisdiction and extension thereof for changes of water rights and augmentation plans were appealable upon entry, as with all other provisions of the judgment and decree of the water judge. *See* ch. 483, sec. 1, § 37–92–304(6), 1977 Colo. Sess. Laws 1703. With respect to retained jurisdiction, this amendment reinforced the 1969 version of section 304(6), which provided that "[a]ll decisions of the water judge shall become part of the judgment and decree hereinafter specified." Ch. 373, sec. 1, § 148–21–20(6), 1969 Colo. Sess. Laws 1210.

The 1981 amendment to section 304(6) extended the mandatory inclusion of a retained jurisdiction provision to judgments and decrees for changes of water rights, in addition to plans for augmentation. Ch. 434, sec. 1, § 37–92–304(6), 1981 Colo. Sess. Laws 1792–93. The 1981 amendment provided that the water judge shall make findings and conclusions regarding the retained jurisdiction period, "including when applicable the historic use to which the water rights involved were put, if any, and the proposed future use of the water rights involved." *Id.* at 1792.

As a result of these amendments, the current version of section 304(6) addresses six features of a judgment and decree involving changes of water rights and augmentation plans: (1) the judgment and decree for changes of water rights and augmentation plans must contain a retained jurisdiction provision for reconsidering the question of injury to the vested rights of others; (2) the water judge has discretion to set the period of retained jurisdiction; (3) the water judge has discretion to extend the period of retained jurisdiction; (4) the water judge's findings and conclusions must accompany the condition setting forth the period of retained jurisdiction; (5) all provisions of the judgment and decree are appealable upon their entry, including those relating to retained jurisdiction or extension of retained jurisdiction; and (6) the water judge has discretion to reconsider the injury question.

Section 37–92–304(6) thus reflects the General Assembly's determination that the retained jurisdiction feature is to be included in every change of water right and augmentation plan decree. However, section 37–92–304(6) also makes clear that this inclusion shall not affect the finality and appealability of the water court's judgment and decree in change of water right and augmentation plan cases, as with other civil actions.

---

**6.** The injury analysis focuses on the time, amount, and location of return flows of surface water and groundwater. If return flows will not be maintained, an additional water source must be located and operated to ensure that water rights of others are not injured. The applicant for the change or augmentation plan must have the opportunity to propose terms and conditions for preventing injury. The Water Court, after taking into account objections and alternative proposed conditions, must include protective conditions in the judgment and decree for preventing injury. *See id.* at 386–88.

The legislative history of the 1977 and 1981 amendments points to the potential conflict and ambiguity between the statutory purpose of making the merits of the judgment and decree final and appealable while also retaining the water judge's ability to subsequently reconsider the question of injury to other water rights in change of water right and augmentation plan cases. Accordingly, we now turn to the General Assembly's hearings concerning section 37–92–304(6) to examine the predicate the legislature intended for invocation of the retained jurisdiction provision.

### 3. Legislative Hearings

The legislative deliberations concerning the 1977 and 1981 amendments to section 37–92–304(6) recognized that changes of water rights and augmentation plans may be simple and straightforward or extraordinarily complex in their administration and, consequently, call for reconsideration as they are placed into operation. In the 1977 proceedings, Senator Fred Anderson stated that the proposed changes were intended to:

> allow the judge to keep open this plan for augmentation for such period as such decision is necessary or desirable to preclude injury.... So what we are saying is that the judge can keep this plan for augmentation open for as long as he deems necessary in order to determine if there is injury to a senior water user.

Transcript of Hearings of Senate Committee on Agriculture, Natural Resources and Energy Concerning Senate Bill 4, March 31, 1977, at 3–4.

Attorney David Brown, an experienced practitioner testifying in support of the 1977 amendment, emphasized to the Senate Committee the importance of providing that:

> an augmentation plan decree would become a final judgment ... *appealable immediately and not wait until the termination of the retained jurisdiction period* .... We have basically in the past left it up to *the Court's discretion,* and they *have come up with all kinds of periods for retained jurisdiction* depending upon if that would be the case, but I think that is the way it ought to remain.

Transcript of Hearings of Senate Committee on Agriculture, Natural Resources and Energy Concerning Senate Bill 4, March 23, 1977, at 1–2 (emphasis added).

Brown explained to the House Committee that the water judge was in the best position, after considering the evidence, to determine the length of the retained jurisdiction period or any extension thereof. This would turn on considerations such as previous experience with the water right, the novelty and complexity of the plan being decreed, questions involving the administrability of the plan, and future effects occurring as the plan is put into effect. He stated:

> [D]ifferent augmentation plans require different amounts of retained jurisdiction. Some augmentation plans are largely corrected or legitimated you might say. Clearly legitimated in depletion that's been occurring over time, for a long period of time such as augmented junior wells. A junior well has been in existence since at least World War II and now we have augmented them with a senior surface right and we really have enough experience that we probably don't need much retained jurisdiction, under that circumstance. In other cases, *where we have very exotic augmentation plan doing something very experimental such as aquifer management or recharge program and things of this nature, it's probably important to have a period of retained jurisdiction* and the parties can argue about it in front of the judge and *the judge will be required to make a decision and set it out in writing so everyone knows what the period of retained jurisdiction is.*

Transcript of Hearings before House Committee on Agriculture, Livestock and Natural Resources Concerning Senate Bill 4, April 25, 1977, at 3 (emphasis added).

Brown then addressed questions regarding the finality and reviewability of judgments and decrees in relation to the retained jurisdiction provision by stating:

> OK, moving down through the rest of this language, we are getting down to Representative Spano's question and at that time we say with that all decisions of the water judge shall become final a final judgment, and the word "final" is key because we are saying that everything in the decree will

become a final judgment and our appeal will lie immediately from that decree, except only to the extent otherwise specified by the water judge. *What I mean by that is, retained jurisdiction answers the question of future injury.* So all issues other than future injury will be immediately appealable. The question of future injury will of course be open to retained jurisdiction for as long the water judge specifies.

*Id.* at 3–4 (emphasis added). Addressing a general policy of not reviewing the merits of the judgment and decree through use of the retained jurisdiction provision, Brown stated:

Let me give you another example. The very right to make a change of water right may be determined by the court. And, if that's determined, that ought to be settled right then and there and the legal issues ought to be appealable from that time. They shouldn't be hooked out of the period of retained jurisdiction. *Retained jurisdiction is a tool to address one specific issue, which is future injury,* and we would like to separate that out and the other legal issues that are filed in an augmentation decree.

*Id.* at 7 (emphasis added).

In 1981, when mandating inclusion of a retained jurisdiction provision for changes of water rights as well as augmentation plans, the General Assembly took into account the testimony of water lawyer Charles Elliott.[7] Like Brown in 1977, Elliott pointed to the example of complex change cases requiring a period of time "in which the changed operation could actually be put into play and everyone could see how the stream system was affected." Transcript of Hearing of Senate Agricultural Committee, April 21, 1981, at 4. Elliott referred in particular to the "real life" consequences of operational changes that turn out to be different than engineers predicted in their court testimony, stating:

We're taking agricultural rights and moving them into industrial operation into a city. We want to make sure that everything was fair. The engineers were telling us this will happen. But let's state in real life, let's have two years or four years. Or sometimes five or six years in which to let this new plan come about, see what happens to the stream system.... Then *instead of it all being on paper, they want real life operations.* So they have usually a set period of time, maybe as little as a couple of months, perhaps, but more likely a couple of years. And *I've seen them as long as five or six years in which the parties can come back to the Court and say, Your Honor, our engineers thought this was going to happen, but it didn't happen,* so let's open the case up again. We're being injured, and let's find some way to stop it.

*Id.* at 5–6 (emphasis added). Like Brown before him, Elliott stated that the "historic use question" would be decided in "the main controversy," not through the use of retained jurisdiction later:

If I can pick up on that for a moment? The case that Mr. Simpson referred to required the judges to look at historic use, deciding whether the water right should be changed or not. Actually, the merits of the controversy. Was there enough use on this right so that a fellow can take out the water somewhere else?

That's a little bit different context. We're talking really about *once the right has already been changed,* and the judge has said, yes, you can make the change; *now how long should we keep this case alive so that individuals can come back in and say the change didn't work out the way they through it would be, I'm going to be injured?*

So I think *the historic use question has really already been addressed in the main controversy about can you change the water right.*

*Id.* at 11–12 (emphasis added).

The General Assembly's proceedings regarding section 37–92–304(6) demonstrate that the focus of retained jurisdiction is upon injurious effects that result from placing the change of water right or augmentation plan

7. Elliott presented testimony on behalf of a committee of the Colorado Water Congress, a frequent participant in legislative hearings regarding water matters. *See* Transcript of Hearing of Senate Agricultural Committee, April 21, 1981, at 12.

into operation, not, as the Water Court said, upon changed circumstances or unanticipated injury. The retained jurisdiction provision addresses the water court's role in predicting, at the time of trial, the potential injurious effect of the change of water right or plan for augmentation, and the measures estimated to prevent injury when the change or plan takes operational effect upon the stream system.

The General Assembly intended that the retained jurisdiction provision of the decree would function as a test period for operation of the change or augmentation plan, in order to test the prediction and finding of non-injury the water court made upon entry of the judgment and decree. If other water rights thereafter experience water shortages resulting from failure to implement the protective conditions, or because the protective conditions adopted in the judgment and decree did not sufficiently protect against injury, the water judge on a sufficient showing of injury reopens the inquiry into protective conditions or, in the alternative, extends the period of retained jurisdiction so that the test period can operate longer. In contrast, historic consumptive use is capable of evidentiary resolution in the process of considering and entering the judgment and decree; exercise of the retained jurisdiction provision is not the context for reopening these determinations.

Next, we review our prior case law and conclude that it is consistent with this construction of section 304(6).

### 4.  Case Precedent

We have considered the applicability of section 304(6) in two previous cases.  *See City of Thornton v. Clear Creek Water Users Alliance,* 859 P.2d 1348 (Colo.1993); *City of Florence v. Board of Waterworks,* 793 P.2d 148 (Colo.1990).

In *Clear Creek Water Users Alliance,* the water judge set the period of retained jurisdiction to take into account the unpredictability of the ultimate location of diversion points for alternative places of storage.  *Clear Creek Water Users Alliance,* 859 P.2d at 1354.  We rejected the proposition that the water court could not decree the change of water right without seeing what injury might

manifest itself in the future, observing that "[i]t is well settled under Colorado law that a water court generally may not grant an application for a change in a water right unless the applicant has demonstrated that the change will not injure the rights of other water users." *Id.* at 1360.  In that case, the water judge "found that there was no showing of injury to the City of Thornton at the time it entered the decree granting the Company's application." *Id.* The water judge, we said, properly reserved the issue of injury from the location of the alternate points of storage for later consideration under the decree's retained jurisdiction provision, because "proving injury in the absence of specified diversion points would be difficult; accordingly, the water court retained jurisdiction for a period of five years." *Id.*

In *City of Florence,* 793 P.2d at 152, we held that section 304(6) does not require a decree provision for retained jurisdiction in cases to adjudicate an exchange, in contrast to changes of water rights and augmentation plans.  In his discussion of the purpose of the retained jurisdiction provision, Justice Erickson commented that section 37–92–304(6):

> is a recognition by the General Assembly that *predictions of future injury* caused by plans for augmentation and changes of water rights involve an inherent amount of uncertainty.  The retained jurisdiction provision allows the water court and water users to achieve flexibility in implementing programs to increase the beneficial use of water and at the same time ensures protection of vested water rights.

*Id.* at 157 (Erickson, J., concurring) (emphasis added).  As we noted above, our precedents support the conclusions we reach in this case.

### 5.  Burdens of Establishing Non Injury and Injury

We have previously decided that the applicant for a change of water right or plan for augmentation bears the initial burden of establishing the absence of injurious results from the proposed change or augmentation plan.  Once the applicant successfully meets this initial burden, however, the objectors have the burden of going forward with evidence of injury to existing water rights.

When contrary evidence of injury has been presented, the ultimate burden of showing absence of injurious effect by a preponderance of the evidence continues to rest on the applicant. *Simpson v. Yale Invs., Inc.,* 886 P.2d 689, 697 (Colo.1994). The issue of injurious effect is inherently fact specific and one for which we have always required factual findings. *State Eng'r v. Castle Meadows, Inc.,* 856 P.2d 496, 508 (Colo.1993). The water court's injury determination involves a factual inquiry that requires it to assess the credibility of competing evidence presented by the parties. *City of Thornton v. Bijou Irrigation Co.,* 926 P.2d 1, 88 (Colo.1996).

We conclude that the retained jurisdiction feature of section 37–92–304(6) reflects two stages of future injury analysis, the first based in some measure on predicting future effects, the second based on operational experience. Because the water court has determined non-injury at the time of decree entry, the persons seeking to invoke reconsideration of the injury question under the decree's retained jurisdiction provision have the initial burden of establishing that injury has occurred to their water rights from placing the change of water right or augmentation plan into operation. Upon such a showing, the burden of showing non-injury shifts to the decree holder. The water judge may require additional or modified protective conditions to prevent injury upon determination that such injury exists. The water judge may also extend the period of retained jurisdiction as long as necessary to ascertain the nonoccurrence of injury from operation of the change or augmentation plan. If a person has met the initial burden of establishing injury within the meaning of the retained jurisdiction provision, and the decree holder does not meet the burden of demonstrating non-injury, the water court abuses its discretion if it refuses to require additional or modified protective conditions to prevent the injury, or refuses to extend the period of retained jurisdiction to ascertain the non-occurrence of injury.

In light of its language, legislative history, and our case precedent, we conclude that the General Assembly intended the retained jurisdiction provision of section 37–92–304(6) to address injurious effects that result from placing the change of water right or augmentation plan into operation. The General Assembly did not intend the retained jurisdiction provision to function as a means for redetermining water court historic use determinations.

We now proceed to examine the Water Judge's order denying Opposers' petition to invoke or extend retained jurisdiction in this case.

### B. Water Judge's Retained Jurisdiction Order

Opposers filed their verified petition to exercise retained jurisdiction in the Consolidated Mutual case while they were litigating the *Farmers High Line Canal & Reservoir* case. At the core of their retained jurisdiction petition, they alleged that use by Golden of its 60s transfers, when combined with the consumptive use allocations the Water Court made through the Consolidated Mutual judgment and decree, could exceed the consumptive use the court found to be attributable to irrigation use of the five priorities historically operated under the LSE Ditch. We quote from Opposers' Opening Brief:

> [A]s is well established, Golden's "share" of the historical consumptive use of Priority 12 is 287 acre-feet; but pursuant to its 60's Transfers, it may be allowed to consume up to 1,105 acre-feet annually, meaning that any consumption of Priority 12 by other owners (like Con Mutual) results in expansion of use beyond the historical total, and injury. If the 60's Transfers had been subject to retained jurisdiction until such time as Con Mutual or other owners changed their interests, the allocation of total historical consumptive use between Golden and Con Mutual could have been adjusted, so each obtained its proper share without injury to the stream.

We turn first to Opposers' contention that Consolidated Mutual's ownership share of beneficial consumptive use should be cut back to offset Golden's alleged overdraft of its allocated share of consumptive use. We then assess Opposers' claim that retained jurisdiction must be kept open in this case until future change applications are resolved.

### 1. Consolidated Mutual's Share of Consumptive Use

■ We conclude that the Water Judge correctly refused to alter the 426 acre-feet of annual historic beneficial consumptive use it allocated to Consolidated Mutual's ownership interest in the five priorities. The right to make a change of one's ownership interest in an appropriation, subject to the adjudication procedures applicable to a change of water right, is one stick in the bundle of a Colorado water right. *Midway Ranches,* 938 P.2d at 523. Even though someone who has effected a de facto change must still apply for a change of water right and prove the nature and extent of the appropriation, *see Santa Fe Trail Ranches,* 990 P.2d at 55, the water rights owner has a property right to use its beneficial consumptive use share of the historic appropriation. *Midway Ranches,* 938 P.2d at 525–26.

■ In this case, Consolidated Mutual did make a change application, did expose itself to volumetric limitations based on the evidence of historic use, did receive limitations on its use, and did obtain a final judgment and decree to exercise its consumptive use allocation based on its ownership interest in the five priorities historically utilized through the LSE Ditch. After hearing expert engineering testimony, the Water Court adopted a methodology for determining the total amount of annual beneficial consumptive use for the LSE Ditch and it allocated a portion of the total beneficial consumptive use to Golden's 60s transfers and a portion to Consolidated Mutual's change of use in this case.

The Water Court did not abuse its discretion in refusing to reopen the amount of Consolidated Mutual's beneficial consumptive use allocation. The Water Court heard engineering testimony, considered exhibits, adopted an appropriate methodology for determining historic beneficial consumptive use of the five priorities, and entered a judgment allocating to Consolidated Mutual an amount of consumptive use credit attributable to its

ownership interest. No appeal was taken. In the absence of an appeal, the consumptive use determinations, which form the basis of the Water Court's delivery, single-use, and ten-year consecutive delivery limitations on Consolidated Mutual's change of water rights, cannot be reviewed. Opposers' proposed remedy would deny water right owners their percentage ownership share of the total ditch-wide historic beneficial consumptive use contrary to the General Assembly's intent and to our holding in *Midway Ranches.*

The language of section 37–92–304(6) and its legislative history demonstrate the General Assembly's choice to give effect to the principles of finality and immediate appealability of the Water Court's judgment and decree. The General Assembly, by creating retained jurisdiction, established a test period for the adjudication and administration statutes to address injury from placing a change of water right or augmentation plan into operation. In doing so, however, the General Assembly did not create a context for reviewing the adjudicated merits of consumptive use determinations the Water Court made upon entry of the judgment and decree.

### 2. Golden's Share of Consumptive Use

Opposers also allege in their petition that a pending additional transfer of water by Golden from the LSE Ditch, when combined with use of its 60s decrees, will aggravate Golden's overdraft of its consumptive use allocation:

[T]he City of Golden now has pending its Application, Case No. 94CW087, in which it seeks to obtain a change of use of its 13.646% ownership interest in the Junior LSE Rights. Golden asserts it is entitled to divert an average of 169 acre-feet annually on its Junior LSE Rights: an average of 154 acre-feet May–Oct.; 15 acre feet Nov.-April, and to consume 104.6 acre-feet annually. If the decree requested by Golden is entered, the total consumption under water rights that historically consumed and burdened the stream in the volume of 1,144 acre-feet annually will rise still further above that volume.

Historic usage of an agricultural appropriation at its decreed point of diversion governs the extent of usage under a change decree. *See Midway Ranches,* 938 P.2d at 521. Thompson testified that the LSE Ditch operated similarly to a mutual ditch; exercise of the five priorities benefited lands throughout the area served by the ditch. The Water Court adopted Thompson's analysis assigning a total cap of 1,144 acre-feet of consumptive use to the five appropriations historically utilized on lands served by the LSE Ditch. This analysis assigned 287 acre-feet of that historic beneficial consumptive use to Golden's 60s transfers.[8] This allocation under the Water Court's judgment and decree, like Consolidated Mutual's allocation, became non-reviewable when no party took an appeal from the judgment and decree in this case.

Opposers attached to their verified petition a report by Thompson in the now-pending Golden transfer case. In this report, Thompson stated that Golden's 13.646% ownership interest in the LSE Junior Rights would yield approximately 100 acre-feet of consumptive use annually. Opposers contend that allowing Golden to use this amount would only increase the overdraft Golden makes of its ownership share of historic LSE Ditch beneficial consumptive use.[9]

Golden's pending change case is the forum for addressing the alleged overdraft. The Water Court intended its judgment and decree in this case to set the framework for future change cases:

> The Court has adopted a ditch-wide method of analysis for the water rights that are the subject of this proceeding, because that method is both appropriate and consistent with the method used in previous transfers from this ditch, particularly those transfers made by the City of Golden. Any future transfers should be based on the same method of analysis to prevent injury to vested water rights.

As we held in *Midway Ranches,* the consumptive use methodology and allocations the Water Court adopts in a noticed and actually litigated change case normally apply to subsequent change cases involving the same water rights. *See id.* at 526. The fundamental object of a change proceeding is to secure to owners their allocated share of historic beneficial consumptive use determined by an appropriate parcel-by-parcel or ditch-wide methodology, while protecting against injury to other water rights when the change of water right or plan operates in the surface and tributary groundwater stream system.

We reject Opposers' contention that retained jurisdiction must be kept open in this case until Golden's pending change case and all future changes by owners of water rights under the LSE Ditch take place. Such a construction of section 37–92–304(6) would entail holding open change and augmentation plan decrees for an indefinite time. Opposers' construction of section 37–92–304(6) is not consistent with the General Assembly's intent. An operative feature of Colorado water law, including section 37–92–304(6), is to provide for final enforceable determinations on a case-by-case basis, so that owners of water rights may proceed with security in the exercise of their allocated water under court decrees that the State Engineer, the Division Engineers, and the Water Commissioners administer pursuant to the terms of those decrees.

We agree that the Opposers have raised a question of injury based on Golden's pending change application for transfer of additional water from the LSE Ditch, but this injury question is not the proper subject of retained jurisdiction in this case. This injury question is proper for Water Court determination in the pending Golden change case on a showing that the proposed change may contribute to Golden exceeding its ownership percentage of the ditch-wide total historic consumptive use, even though that

8. In *Farmers High Line Canal & Reservoir Co.,* we determined that Thompson's analysis "fixed Golden's share of Priority 12 at an average of 287 acre-feet per year, subject to a deduction of 9 acre-feet for small parcel owners." *Farmers High Line Canal & Reservoir Co.,* 975 P.2d at 195 n. 8. We adhere to this determination.

9. Assuming that the Water Court determines in Golden's pending change case that Golden's

ownership interest in LSE Junior Rights yields approximately 100 acre-feet of consumptive use annually—employing the method of analysis the Water Court adopted in this case—Golden's ownership share of historic consumptive use for the five priorities would be approximately 378 acre-feet.

change case seeks a change only of Golden's LSE Junior rights. Necessarily, the Water Court's role in that case involves determining what consumptive use Golden actually makes, or may make in the future, in the exercise of its 60s decrees and the consumptive use yield of Golden's ownership interest in the LSE Junior Rights, questions of fact that are not contained in the record or addressed by the Water Court in the case before us, and which are not suited to exercise of the retained jurisdiction provision in this case.

■■■ A change of water right risks requantification based on actual historic consumptive use. *See Pueblo West Metro. Dist. v. Southeastern Colo. Water Conservancy Dist.*, 717 P.2d 955, 959 (Colo.1986). The Water Court must address future changes of LSE Ditch water for their injury-producing effects and fashion protective conditions in

regard thereto, giving effect to the methodology it adopted and the consumptive use allocations it made through the judgment and decree in this case, so as to prevent an owner from enlarging upon its share of historic consumptive use.[10]

### III.

Accordingly, we affirm the Water Court's order denying Opposers' petition to invoke the retained jurisdiction provision of the judgment and decree in this case or, alternatively, to extend the period of retained jurisdiction.

---

**10.** We said in *Farmers High Line Canal & Reservoir Co.*:

[M]any of the decrees entered under the older injury-prevention method of flow rate abandonment conflict with fundamental concepts underlying our state's system of water rights administration. With the advent of improved engineering techniques, courts began to utilize another approach to prevent injury to juniors in change proceedings. *See Cor-*

bridge, 69 U. Colo. L.Rev. at 512. Under the modern method, courts now translate the petitioner's historical consumptive use into a volumetric limitation stated in acre-feet. Courts then incorporate the volume limit into the express terms of the decree. *See id.* Therefore, most modern change decrees impose an acre-foot limit on the amount of water an appropriator may consume in the average year. 975 P.2d at 198.