**FARMERS RESERVOIR AND IRRIGATION COMPANY; The Farmers High Line Canal and Reservoir Company; the City of Arvada; the City of Westminster, Plaintiffs–Appellants,**

v.

**The CITY OF GOLDEN, Defendant–Appellee,**

and

**Richard Stenzel, Division Engineer, Water Division No. 1, Appellee pursuant to C.A.R. 1(e).**

No. 01SA105.

Supreme Court of Colorado, En Banc.

April 8, 2002.

John P. Akolt, III, Denver, CO, Attorney for Farmers Reservoir and Irrigation Company.

Gaunt, Dirrim, Coover & Steele, P.C., Brice Steele, IV, Brighton, CO, Attorneys for The Farmers High Line Canal and Reservoir Company.

Moses, Wittemyer, Harrison & Woodruff, P.C., Veronica A. Sperling, Boulder, CO, Attorneys for the City of Arvada.

Carlson, Hammond & Paddock, LLC, Mary Mead Hammond, Lee H. Johnson, Denver, CO, Attorneys for the City of Westminster.

Porzak Browning & Bushong LLP, Glenn E. Porzak, Steven J. Bushong, Boulder, CO, Trout Witwer & Freeman, P.C., James W. Witwer, Denver, CO, Attorneys for the City of Golden.

Justice RICE delivered the Opinion of the Court.

Two water rights decrees ("60s decrees") entered in 1961 and 1964 ("60s proceedings") gave the City of Golden ("Golden") the right to divert up to 4.66 cubic feet per second ("c.f.s.") of Priority 12 water[1] continuously from May 1st through October 31st. In *Farmers High Line Canal & Reservoir Co. v. City of Golden*, 975 P.2d 189 (Colo.1999), we held that claim preclusion prohibited the imposition of volumetric limits on these rights. 975 P.2d at 192. We reasoned that appellants were "precluded from seeking a modification of the decrees at issue because the decrees are unambiguous and because an earlier change proceeding fully litigated the terms and conditions of the decrees necessary to prevent injury to junior appropriators." *Id.* However, we also recited the

---

1. In October of 1884, the District Court of Arapahoe County adjudicated Clear Creek water rights with an appropriation date of May 13, 1861 for diversion of 9.9 c.f.s. by means of the Claus and Couch Ditch. *Farmers Reservoir & Irrigation Co. v. Consol. Mut. Water Co.*, 33 P.3d 799, 803 (Colo.2001). In June of 1908, successors in interest to a portion of Priority 12 water then transferred 8.6 c.f.s. from the Claus and Couch Ditch to the Lee, Stewart, and Eskins Ditch. *Id.* Priority 12 "is among the most senior water rights in the South Platte Basin; in fact, it is junior only to 209 rights out of more than 36,000 rights." *Farmers High Line Canal & Reservoir Co.*, 975 P.2d at 193.

well-established rule that " 'where an owner of a decreed right, after obtaining a decree permitting a change in point of diversion or a change in use, enlarges or attempts to enlarge the use of his water rights to the injury of other appropriators, the permissive decree does not bar relief to the latter.' " *Id.* at 202 (quoting *City of Westminster v. Church*, 167 Colo. 1, 9, 445 P.2d 52, 55 (1968)). According to this rule, we concluded that the appellants' claim of enlarged use due to increased lawn irrigation constitutes an allegation of a changed circumstance sufficient to defeat Golden's assertion of claim preclusion. *Id.* at 203. Because the water court made no findings or rulings with regard to this claim, we remanded the case to the water court for this purpose. *Id.* at 204. On remand, the water court held that Golden had not impermissibly expanded its use of Priority 12 water because it had not applied a greater amount of Priority 12 water to lawn irrigation than was anticipated in the 60s proceedings. With regard to the number of acres of lawn Golden has irrigated with Priority 12 water, the water court made no ruling, holding instead that whether Golden has increased the acreage of lawn it irrigates with Priority 12 water since the 60s proceedings "does not address the basic questions regarding Golden's entitlement under the present decree, or the extent to which Golden has exercised its entitlement." We affirm in part and reverse in part.

■ In *Farmers High Line Canal & Reservoir Co.*, we held that the calculations of William W. Wheeler, an expert hydrologist who testified on behalf of Golden during the first of the 60s proceedings, govern the interpretation of the 60s decrees. 975 P.2d at 201. These calculations attempted to balance the consumptive use of the water by previous owners of the irrigation right with the amount of water that would be consumed by Golden's municipal use of the water after the transfer. *See Farmers High Line Canal & Reservoir Co.*, 975 P.2d at 201. Therefore, because of the unique history of these decrees, the determinative inquiry in considering whether Golden has impermissibly expanded its use of Priority 12 water is whether Golden is consuming more Priority 12 water than Wheeler anticipated. Based on

Wheeler's calculations, it is possible for Golden to increase its consumption of Priority 12 water by: (1) increasing the amount of Priority 12 water it applies to lawn irrigation or (2) increasing the number of acres it irrigates with Priority 12 water. Because either would upset the balance struck by Wheeler when he concluded that 4.66 c.f.s. could be transferred to Golden without injuring junior appropriators, *both* the number of acres Golden irrigates with Priority 12 water as well as the amount of Priority 12 water Golden applies to lawn irrigation are relevant to a determination of whether Golden has impermissibly expanded its use of Priority 12 water.

Wheeler based his conclusion that 4.66 c.f.s. of Priority 12 water could be transferred to Golden without injury to junior appropriators on the assumption that Golden would only irrigate 225 acres of lawn with this water. Thus, we conclude that Golden would impermissibly expand its use of Priority 12 water by irrigating more than 225 acres of lawn with this water. Because the record demonstrates that Golden irrigated approximately 267 acres of lawn in 1994, we hold that Golden has impermissibly expanded its use of Priority 12 water by irrigating more than 225 acres of lawn with this water.

Wheeler also based his conclusion that 4.66 c.f.s. of Priority 12 water could be transferred to Golden without injury to junior appropriators on the assumption that Golden would only apply 53% of the Priority 12 water it is entitled to divert during the irrigation season, or 900 acre-feet, to lawn irrigation. Thus, we conclude that Golden would impermissibly expand its use of Priority 12 water by applying more than 53% of the Priority 12 water it is entitled to divert during the irrigation season, or 900 acre-feet, to lawn irrigation. Because the record demonstrates that Golden has never applied more than 476 acre-feet of water to lawn irrigation, we hold that Golden has not impermissibly expanded its use of Priority 12 water by applying more than 53% of the Priority 12 water it is entitled to divert during the irrigation season, or 900 acre-feet, to lawn irrigation.

We preface our analysis of whether Golden has impermissibly expanded its use of Priority 12 water with a review of the general principles governing change proceedings and a discussion of the concept of enlarged use.

## I. CHANGE OF WATER RIGHTS AND ENLARGED USE

"Scarcity and value of the water resource has always driven Colorado water law; accordingly, the state's policy is to efficiently manage, administer, and optimize water for operation of as many decreed uses as there is available supply." *Farmers Reservoir & Irrigation Co.*, 33 P.3d at 806; *see also* § 37–92–501(2)(e), 10 C.R.S.2001 ("[All rules and regulations shall have as their objective the optimum use of water consistent with preservation of the priority system of water rights.]"). Flexibility, therefore, is essential to achieving this goal, and "flexibility emanates from the fact that the right of water use can be changed." *Empire Lodge Homeowners' Ass'n. v. Moyer*, 39 P.3d 1139, 1147 (Colo.2001).

**2.** Today, this right to change the point of diversion or use of one's water right is more important than ever, especially for Colorado's rapidly growing municipalities. "[A]bout 80 percent of all water diversions and withdrawals in the West go to agricultural uses, while the demand for water is largely in growing urban areas." *See* James N. Corbridge, Jr. & Teresa A. Rice, *Vranesh's Colorado Water Law* 222 (rev. ed. 1999). Thus, for municipalities, "water right changes and transfers have become the dominant method of meeting new water needs." James N. Corbridge, Jr., *Historical Water Use and The Protection of Vested Rights: A Challenge for Colorado Water Law*, 69 U. Colo. L. Rev. 503, 510 (1998). In fact, "the typical means of acquiring water today is to purchase an existing water right and apply for a change, including a new point of diversion and a change in use from agricultural to municipal or other uses." *Id.; see also* Corbridge and Rice, *supra*, at 222–23 ("over 50% of water rights changes in Colorado over the past few decades have involved changes from agricultural to municipal and other non-agricultural uses" (citing Natural Resources Law Center, *Agricultural to Urban Water Transfers in Colorado: An assessment of the Issues and Options*, University of Colorado School of Law, Research Report RR11 (1993))); *Farmers Reservoir & Irrigation Co.*, 33 P.3d at 806 ("Provisions of the Water Resources Determination Act of 1969 ... for adjudication of water rights changes, exchanges, and augmentation plans allow newer uses of

Not only is the right to change the use of a vested water right an important component of the policy underlying the prior appropriation system as a whole, it is also an important stick in the bundle of rights that constitute a Colorado water right. *Williams v. Midway Ranches Prop. Owners Ass'n.*, 938 P.2d 515, 523 (Colo.1997).[2] Notwithstanding its importance, the right to change is not absolute. *New Cache La Poudre Irrigating Co. v. Water Supply & Storage Co.*, 49 Colo. 1, 3, 111 P. 610, 611 (1910). We have stated time and again that the need for security and predictability in the prior appropriation system dictates that holders of vested water rights are entitled to the continuation of stream conditions as they existed at the time they first made their appropriation.[3] *Farmers Highline Canal & Reservoir Co. v. City of Golden*, 129 Colo. 575, 579, 272 P.2d 629, 631–32 (1954); *see also Santa Fe Trail Ranches Prop. Owners Ass'n.*, 990 P.2d at 52; *Williams*, 938 P.2d at 522; *Orr v. Arapahoe Water & Sanitation Dist.*, 753 P.2d 1217, 1223 (Colo.1988); *Church*, 167 Colo. at 13–16,

water, such as municipal and recreational uses, to come into being and operate consistent with the administration of decreed water rights."); *Santa Fe Trail Ranches Property Owners Ass'n. v. Simpson*, 990 P.2d 46, 55 (Colo.1999).

**3.** This concept is codified in section 37–92–305(3), 15 C.R.S. (2001), which sets forth the standard by which an application seeking a change in point of diversion must be evaluated:

A change of water right or plan for augmentation, including water exchange project, shall be approved if such change or plan will not injuriously affect the owner of or persons entitled to use water under a vested water right or a decreed conditional water right. In cases in which a statement of opposition has been filed, the applicant shall provide to the referee or to the water judge, as the case may be, a proposed ruling or decree to prevent such injurious effect in advance of any hearing on the merits of the application, and notice of such proposed ruling or decree shall be provided to all parties who have entered the proceedings. If it is determined that the proposed change or plan as presented in the application and the proposed ruling or decree would cause such injurious effect, the referee or the water judge, as the case may be, shall afford the applicant or any person opposed to the application an opportunity to propose terms or conditions which would prevent such injurious effect.

445 P.2d at 58–59; *Enlarged Southside Irrigation Ditch Co. v. John's Flood Ditch Co.*, 116 Colo. 580, 584–87, 183 P.2d 552, 554–55 (1947) [hereinafter *John's Flood I* ]; *Comstock v. Ramsay*, 55 Colo. 244, 257, 133 P. 1107, 1111 (1913). From this principle springs the equally well-established rule that a change of water right cannot be approved if the change will injuriously affect the vested rights of other water users. *See City of Thornton v. Bijou Irrigation Co.*, 926 P.2d 1, 80 (Colo.1996); *Green v. Chaffee Ditch Co.*, 150 Colo. 91, 106, 371 P.2d 775, 783–84 (1962). "A classic form of injury involves diminution of the available water supply that a water rights holder would otherwise enjoy at the time and place and in the amount of demand for beneficial use under the holder's decreed water right operating in priority." *Farmers Reservoir & Irrigation Co.*, 33 P.3d at 807; *cf. City of Thornton*, 926 P.2d at 80 ("It has been fundamental law in this state that junior appropriators have rights in return flow to the extent that they may not be injured by a change in the place of use of the irrigation water which provides that return flow.").

■ To ensure that this most fundamental condition on the right to change the use of a water right is satisfied, a change in use must be accomplished "(1) by proper court decree," (2) only for "the extent of use contemplated at the time of appropriation," and (3) "strictly limited to the extent of formal actual usage."[4] *Santa Fe Trail Ranches Prop. Owners Ass'n.*, 990 P.2d at 53. "With its application, notice, and judicial determination requirements, change of water right adjudication serves to restrict an appropriation to the amount of its perfected use, while also allowing the priority of the right to be utilized for different uses and at different locations." *Id.* at 55. "In this manner, Colorado law promotes both security for water rights and flexibility for new uses and transfers of existing rights." *Id.*

■ Implicit within these basic precepts of our prior appropriation system is the elementary and straightforward principle that a change in the use of a water right cannot effect an enlargement in the use of that right. *Santa Fe Trail Ranches Prop. Owners Ass'n.*, 990 P.2d at 54; *Farmers High Line Canal & Reservoir Co.*, 975 P.2d at 203; *Williams*, 938 P.2d at 523; *Orr*, 753 P.2d at 1223–1224; *Weibert v. Rothe Bros., Inc.*, 200 Colo. 310, 316–17, 618 P.2d 1367, 1371–72 (Colo.1980); *John's Flood I*, 116 Colo. at 586, 183 P.2d at 554. In *Church*, we acknowledged the prevalence of actions by junior appropriators to enjoin a municipality's enlarged use of a water right after changing that right from agricultural to municipal use. 167 Colo. at 13–14, 445 P.2d at 58. This prevalence, we explained, was attributable to the fact that one of the principal dangers attending a change of water right from agricultural to municipal use is that the municipality will attempt to enlarge its use of the water right beyond the historical agricultural usage. *Id.*

■ Safeguarding junior appropriators' right to immutable stream conditions in the face of a change from agricultural to municipal use requires that there be parity in the consumptive use of the right before and after the change—and that this parity endures. *See Farmers Highline Canal & Reservoir Co.*, 129 Colo. at 585–586, 272 P.2d at 635 (holding that change in water right from agricultural to municipal use must not increase consumptive use of the water transferred and that satisfying this condition requires balancing agricultural consumptive use before the transfer with the anticipated municipal consumptive use after the transfer); *Church*, 167 Colo. at 15, 445 P.2d at 59 ("Defendant City of Westminster could not enlarge upon its predecessors' use of the water rights by changing periodic direct flow for irrigation to a continuous flow for storage. Such a change would necessarily increase the ultimate consumption from the

§ 37–92–305(3), 15 C.R.S. (2001).

**4.** Water engineers are crucial to this task. Typically, as in this case, they are responsible for establishing: "(1) the historic beneficial consumptive use of the appropriations at issue; and

(2) the protective conditions that will maintain the conditions of the stream upon which decreed water rights depend in order to prevent injury." *Farmers Reservoir & Irrigation Co.*, 33 P.3d at 807 (citing Daniel S. Young & Duane D. Helton, *Developing a Water Supply in Colorado: The Role*

stream to the detriment of other appropriators."); *Danielson v. Kerbs Agric.,* 646 P.2d 363, 373 (Colo.1982) ("It is a fundamental principle that the consumptive use of water may not be increased to the injury of other appropriators."). In *Williams,* we explained that, "Determining the historic usage of a tributary water right is not restricted to change and augmentation plan proceedings"; equitable relief is also available, upon appropriate proof, to remedy expanded usage that injures other decreed appropriations. 938 P.2d at 522–23. Because enlargement of use constitutes a change in circumstance sustained upon evidence that did not exist at the time of the original change proceeding, claim preclusion does not bar relief therefor. *Farmers High Line Canal & Reservoir Co.,* 975 P.2d at 202; *Church,* 167 Colo. at 9, 445 P.2d at 56 (holding that previous change proceeding "did not immunize the City of Westminster against subsequent equitable actions by junior appropriators designed to maintain the historic level of use by the City of its decreed rights"); *see also New Cache La Poudre Irrigating Co. v. Water Supply & Storage Co.,* 74 Colo. 1, 5–6, 218 P. 739, 740–41 (1923) (reasoning that although predecessor decision, *New Cache La Poudre Irrigating Co. v. Water Supply and Storage Co.,* 49 Colo. 1, 111 P. 610 (1910), established that a change of water right may be denied on grounds of enlargement only where the change necessarily or by reasonable inference enlarges the use of the right, the change decree will not preclude a subsequent claim that the use of the right has actually been enlarged). Nor does it bar a water court from determining the extent of historic use under the water right in ascertaining whether there has been an injurious enlargement. *Williams,* 938 P.2d at 523, 525; *John's Flood I,* 116 Colo. at 586, 183 P.2d at 555; *see also Farmers High Line Canal & Reservoir Co.,* 975 P.2d at 203. Of course, where historic consumptive use has been determined in a previous proceeding relit-

igation of that element will not be permitted. 975 P.2d at 203.

In *Farmers High Line Canal & Reservoir Co.,* we acknowledged that the "seminal case" of *John's Flood I* was "particularly relevant" to the issue of whether Golden has expanded its use of Priority 12 water. *Farmers High Line Canal & Reservoir Co.,* 975 P.2d at 203. In fact, there are striking similarities between that dispute and the one presently before us. In *John's Flood I,* plaintiffs sought to enjoin defendants' enlarged use of a decreed water right. 116 Colo. at 583, 183 P.2d at 553. Specifically, plaintiffs alleged that the water right was being used to irrigate additional lands. *Id.* This additional irrigation, plaintiffs argued, caused an enlarged use both in quantity and time, diminished the supply of seepage and return water available to other appropriators, and resulted in increased losses from evaporation. *Id.* at 584, 183 P.2d at 554. The trial court failed to make findings of fact on this issue. *Id.* We held that this omission was erroneous and remanded the case to the trial court for this purpose. *Id.* at 588, 183 P.2d at 555.

We explained, "The owner of a priority for irrigation has no right, as against a junior appropriator, to waste it; neither has he the right to increase the amount or extend the time of his diversion *to enable him to put it to double use by irrigation of other lands in addition to those for which it was appropriated.*" *Id.* at 586, 183 P.2d at 554 (emphasis added); *accord Weibert,* 200 Colo. at 316, 618 P.2d at 1371; *New Cache La Poudre Irrigating Co.,* 49 Colo. at 7, 111 P. at 612. "[T]he acreage under irrigation is the principal basis of measurement of the use of water in the adjudication of priorities, and *use on increased acreage of necessity is evidence, although rebuttable, of increased use either in volume or time.*"[5] *John's Flood I,* 116 Colo. at 587–88, 183 P.2d at 555 (emphasis added); *accord Williams,* 938 P.2d at 523. Therefore, we instructed the trial court to determine on remand whether defendants had increased their use of the decreed right by

*of an Engineer,* 3 U. Denv. Water L. Rev. 373, 382–88 (2000)).

5. *John's Flood I* also points out that *Cache La Poudre Co. v. Larimer & Weld Reservoir. Co.,* 25

Colo. 144, 53 P. 318 (1898) and *Fulton Irrigation Ditch Co. v. Meadow Island Co.,* 35 Colo. 588, 86 P. 748 (1906), which express the contrary view that use of water on increased acreage does not presumptively establish increased burden, had

irrigating additional acreage, and if so, to enjoin the impermissible enlargement. 116 Colo. at 588, 183 P.2d at 555–56.

On remand, the trial court found that defendants had not diverted a greater quantity of water, either in volume or time, than had historically been diverted, and on this basis concluded that defendants had not enlarged the use of the right. *Enlarged Southside Irrigation Ditch Co. v. John's Flood Ditch Co.,* 120 Colo. 423, 424–25, 210 P.2d 982, 983 (1949) [hereinafter *John's Flood II* ]. In plaintiffs' second appeal to this court, we reversed and held that continuing to irrigate lands historically irrigated under the decree while at the same time irrigating additional lands under the decree "decreases the amount [of water] available for the use of plaintiffs ... in the irrigation of their lands, and is a substantial change to their detriment in the conditions existing on the stream at the date of, and subsequent to, their appropriations." *Id.* at 429–30, 210 P.2d at 985; *accord Empire Lodge Homeowners' Ass'n.,* 39 P.3d at 1156 ("The enlargement doctrine prohibits an appropriator from expanding its historical appropriation, for example, by developing new lands for irrigation, while continuing to irrigate the lands historically irrigated under the water right."). Accordingly, we instructed the trial court to enter an order enjoining the irrigation of the additional lands. *John's Flood II,* 120 Colo. at 430, 210 P.2d at 985.

We now apply these principles to the case at hand.

## II. WHETHER GOLDEN HAS ENLARGED ITS USE OF PRIORITY 12 WATER.

 By balancing the amount of water consumed by the previous owners of the

irrigation right with the amount of water that would be consumed by Golden's municipal use of the water, Wheeler concluded that 4.66 c.f.s. of Priority 12 water could be transferred without depletion to the stream, and hence without injury to junior appropriators. These calculations formed the basis of the 60s decrees. *Farmers High Line Canal & Reservoir Co.,* 975 P.2d at 201. Accordingly, if Golden is consuming more water today than Wheeler anticipated it would consume, the balance he struck in crafting the flow rate limitations in the 60s decrees has been disrupted, and there has been an enlargement of use that must be enjoined. We therefore compare the amount of water Wheeler predicted would be consumed by Golden's municipal use of the water, as reflected in his calculations and testimony,[6] with the evidence of Golden's current municipal use of Priority 12 water.[7] If Golden uses its Priority 12 water to irrigate more acres of lawn today than Wheeler determined it would irrigate, or if Golden applies a greater amount of Priority 12 water to lawn irrigation than Wheeler determined it would apply, Golden will have increased its consumptive use of Priority 12 water and thereby disrupted the balance Wheeler struck in concluding that 4.66 c.f.s. of Priority 12 water could be transferred to Golden without injuring junior appropriators. Such an increase would constitute precisely the kind of enlarged use our case law forbids. *See Farmers High Line Canal & Reservoir Co.,* 975 P.2d at 203 (allowing Golden to enlarge its use of Priority 12 water beyond that anticipated at the time the 60s decrees were entered either by irrigating additional acres of lawn with its Priority 12 water or by increasing the amount of Priority 12 water it applies to lawn irrigation would "contradict the most basic principles governing all water decrees").

---

already been overruled by subsequent decisions. *John's Flood I,* 116 Colo. at 587, 183 P.2d at 555.

**6.** It is proper to consider Wheeler's testimony in the 1961 change proceeding for this purpose. "We have consistently held that statements of claim and transcripts of testimony in adjudication proceedings are admissible evidence in other actions involving the construction or interpretation of water decrees." *Orchard City Irrigation Dist. v. Whitten,* 146 Colo. 127, 135, 361 P.2d

130, 134 (1961); *see also City of Colorado Springs v. Yust,* 126 Colo. 289, 249 P.2d 151 (1952).

**7.** Municipal use can be divided into two components, inside use and outside use. Very little of the water used indoors—for example, by washing machines, dishwashers, sinks, showers, and toilets—is consumed. In contrast, outdoor use, which we, like the water court, use synonymously with lawn irrigation, is highly consumptive.

Thus, defining the limits of the permissible use Golden may make of its Priority 12 water is a necessary antecedent to determining whether Golden has enlarged its use of Priority 12 water. Because these limits are defined by Wheeler's calculations and testimony in the 60s proceedings, we begin our discussion with a recitation of the relevant portions of Wheeler's testimony in the first of those proceedings.

## A. THE 1960s PROCEEDINGS

Golden acquired the 4.66 c.f.s. of Priority 12 water that is the subject of this dispute, in two separate transactions during the 1960s ("60s proceedings"). In the first of these, Golden sought to purchase 2.86 c.f.s. of Priority 12 water from James Mannon and William Vaughn. To facilitate the sale, Mannon and Vaughn petitioned the water court for a decree permitting a change in use from agricultural irrigation to municipal use and a change in point of diversion from the Lee, Stewart, and Eskins Ditch to the Church Ditch. Several parties with water rights junior to Priority 12 filed objections to this change petition. Among other things, they argued that they would be injured because changing the use of the 2.86 c.f.s. of Priority 12 water from agricultural to municipal use would result in increased consumption of the water and thus decreased return flows. A trial was held to determine whether the proposed change would indeed harm the junior appropriators.

During the trial, William W. Wheeler, one of the preeminent water engineers of his day, testified on behalf of Golden. It was Wheeler who had determined that if certain terms and conditions were imposed on the transfer, 2.86 c.f.s. of Priority 12 water could be transferred to Golden without causing injury to junior appropriators. He explained that, "By balancing off the consumptive use of the water ... in Golden versus that which had been used in the irrigated lands under the ditch, we were ... able to arrive at what we feel is an amount which could be transferred." That amount, Wheeler testified, was 2.86 c.f.s.

Wheeler explained how he had computed consumptive use for the City of Golden:

We based that upon the actual historic use by the City of Golden, as given to us in 1951, and again checked it for their uses in 1956, to see whether or not the 1951 conditions held. In that we took the [non]irrigation season uses as being the basic or household use. All water over and above that quantity we assumed applied to lawns. We measured acreage irrigated in Golden in 1951, that is, about half of it, as representative areas within the City, and then estimated [that] the rest of the area that would be irrigated would be comparable to that we had analyzed.

At that time we found, as I remember, 98 acres irrigated by Golden. In going back and checking records for 1956, we found that the same conditions prevailed with respect to basic use and with respect to water which would be applied to the lawns. We then assumed that the total 2.86 would be taken into the system, part of which would go on lawns and part of which would go through a domestic supply or through the sanitary sewer system as waste for household use. In our later calculations it figures 138 acres could be irrigated with the 2.86 c.f.s. transfer.

Now we must realize if the 2.86 is transferred, part is used for household use and part is used for irrigation. There is essentially no consumptive loss on the household use. We apply 1.5 percent consumptive use on the water which went through the houses....

In contrast to the household use of water, lawn irrigation is highly consumptive. Wheeler testified that depending on application rates, anywhere from 75% to 95% of the water applied to lawns is consumed. Accordingly, the number of acres of lawn that would be irrigated with Priority 12 water and the amount of Priority 12 water that would be applied to these acres were critically important to Wheeler's calculations balancing the consumptive use of Priority 12 water before and after the transfer; and therefore, Wheeler testified extensively concerning the number of acres Golden would irrigate with Priority 12 water and the amount of Priority 12 water that would be applied thereto.

Wheeler's testimony makes clear that he assumed Golden would only irrigate 138 acres of land with the 2.86 c.f.s. of Priority 12 water transferred in the first proceeding. It also makes clear that this assumption was integral to his ultimate conclusion that changing 2.86 c.f.s. from agricultural to municipal use would not result in increased consumption of Priority 12 water and therefore would not injure junior appropriators. For instance, explaining how he derived the number of acres that would have to be dried up as a result of the transfer, Wheeler testified that:

The irrigated land under the ditch was sketched off on aerial photos and permeameter, from which we found was a total of 575 acres of irrigated, slightly less than 75 acres of which was under Mannon and Vaughn's property. Now, in our illustrations we figured that 138 acres in Golden would be irrigated if the 2.86 were transferred. If we used only the Mannon and Vaughn land we would have 75 acres, so the difference then between the 75 and the 138 of 63 acres would be the amount of land that would have to be dried up under the Lee, Stewart and Eskins by their foregoing [sic] the use of the Mannon and Vaughn waters.

Like the number of acres Wheeler assumed Golden would irrigate with Priority 12 water, the amount of Priority 12 water Wheeler assumed Golden would apply to lawn irrigation played a central role in his calculations balancing consumptive use before and after the transfer. Wheeler assumed that the 2.86 c.f.s. of Priority 12 water would be used in exactly the same way as the rest of Golden's municipal water supply. In 1956, Golden had applied 36% of its annual water supply to lawn irrigation. Thus, based on this pattern of municipal use in 1956, Wheeler testified that, assuming Golden diverted and utilized the 2.86 c.f.s. of Priority 12 water twenty-four hours a day, 365 days a year, 36% of the 2.86 c.f.s. transferred would be used for lawn irrigation. However, of the

water Golden used during the six-month irrigation season in 1956, 53% was applied to lawns. Again based on the assumption that Golden would use the 2.86 c.f.s. in exactly the same way it used the rest of its water supply, Wheeler testified that if Golden diverted 2.86 c.f.s. continuously from May 1st to October 31st, "approximately 50%" of the 2.86 c.f.s. would be used for lawn irrigation.[8] Elaborating, Wheeler described precisely how he determined the amount of Priority 12 water that would be applied to lawn irrigation during the irrigation season:

Throughout the irrigation season the water we apply to lawns was applied in direct proportion to what [Golden] had used historically. In other words, one particular month you might have 60 per cent of the total water supply available used on lawns and the other 40 per cent going through the domestic system. In the early spring that might be reversed. You might have 40 per cent on the lawns and 60 per cent through the domestic system. In other words, we assume that the 2.86 would be used 100 per cent of the time if transferred.[9] Then we went through and took actual requirements per month to be equivalent to the 2.86, and that was distributed between the domestic supply, purely domestic or household supply, and the irrigation supply.

Other terms and conditions Wheeler testified were necessary to protect junior appropriators and ensure that consumptive use remained the same after the transfer of the 2.86 c.f.s. included: abandoning a portion of Priority 12 water to the stream, abandonment of a portion of Priority 12 water to the Lee, Stewart, and Eskins Ditch, and season of use restrictions.

Notwithstanding Wheeler's testimony, the water court denied the petition because it concluded that the petitioners' evidence failed to demonstrate that the change would not injure junior appropriators. Mannon and Vaughn appealed. In *Mannon v. Farmers' High Line Canal & Reservoir Co.*, 145 Colo.

8. Fifty-three percent is the actual percentage of the water Golden used during the 1956 irrigation season to water lawns.

9. When asked whether by "100 percent of the time" he meant "twenty-four hours a day for a full 365 days a year," Wheeler responded, "That is correct."

379, 360 P.2d 417 (1961), we held that the water court must "make inquiry as to whether terms and conditions are feasible and that it be satisfied as to impossibility of imposing conditions before it is justified in entering an order of dismissal of a petition." 145 Colo. at 390, 360 P.2d at 423. Accordingly, we remanded the case to the water court to determine whether a change decree with limiting conditions would be sufficient to prevent injury to junior users as a result of the transfer. Before the court could consider this issue, however, the parties entered into a court-approved consent decree. The terms and conditions proposed by Wheeler were decreed to control Golden's use of Priority 12 water.

Three years later Golden obtained another consent decree permitting it to change the point of diversion—from the Lee, Stewart, and Eskins Ditch—and the use—from agricultural to municipal—of 1.8 c.f.s. of Priority 12 water it had purchased from Mauz and Thuet. Because there was no trial, Wheeler did not give testimony on the record concerning this second change petition. However, as we noted in *Farmers High Line Canal & Reservoir Co.*, like the 1961 decree, Wheeler prepared the engineering study that "formed the basis of the terms agreed upon by the parties to the consent decree." 975 P.2d at 194. Moreover, in the second change proceeding, Wheeler applied "the same knowledge regarding Golden's municipal use patterns that he relied upon in the first change proceeding." *Id.*

"The cumulative effect of the express terms of the 1961 and 1964 decrees gave Golden the right to divert up to 4.66 c.f.s. of water from May through October of each year." *Id.* Although we refused to read volumetric limits into these decrees in *Farm-*

ers *High Line Canal & Reservoir Co.*, we took great care to emphasize the importance of Mr. Wheeler's calculations to the interpretation of these decrees:

> Wheeler's estimates of the historical consumptive use of Priority 12 formed the basis of the terms of the 60s decrees. In fact, appellants admit that Wheeler's flow rate calculations were based on his attempt to "balance" the amount of water consumed by the previous owners of the irrigation right with the amount of water that would be consumed by Golden's municipal use of the water. Wheeler concluded that his calculations, which required a partial abandonment of flow back to the stream, were sufficient to prevent injury to junior appropriators. These calculations were ultimately incorporated into the resulting decrees. During the trial in the instant litigation, appellants' experts agreed that the purpose of the abandonment provisions in the 60s decrees was to match historical use to future use and to prevent injury as a result of expanded use. Therefore, there is no dispute as to whether Wheeler's calculations formed the basis of the terms of the 60s decrees.

*Farmers High Line Canal & Reservoir Co.*, 975 P.2d at 201.

In other words, the data on which Wheeler relied to determine how Golden would use Priority 12 water justified his conclusion that 4.66 c.f.s. could be changed to municipal use without increasing consumption and injuring junior appropriators. Thus, like the terms and conditions themselves, this data serves as a limit demarcating permissible from enlarged use.[10]

10. *Orr* only permits us to revisit volumetric limits when "the historical usage of the original surface irrigation rights [has] not been determined." *Williams*, 938 P.2d at 523. In *Farmers High Line Canal & Reservoir Co.*, we held that this issue had indeed been determined and thus refused to imply outright volumetric limits into Golden's Priority 12 decrees. 975 P.2d at 201. The issue has been determined in this sense: Wheeler's calculations balancing consumptive use of the water by previous owners of the irrigation right with the amount of water that would be consumed by Golden's municipal use of the water after the transfer control Golden's use of the 4.66 c.f.s. of Priority 12 water, and volumetric limits were implicit in the calculations on which Wheeler concluded that 4.66 c.f.s. could be transferred without injury to junior appropriators. In other words, these calculations, and the assumptions upon which they are based—for instance, that Golden will not use more than 53% of the water it diverts during the irrigation season to water lawns and that Golden will not irrigate more than 225 acres—are conditions of use, which, if surpassed, constitute an impermissible expansion of use.

## B. WHETHER GOLDEN HAS EXCEEDED THE NUMBER OF ACRES OF LAWN IT MAY IRRIGATE WITH PRIORITY 12 WATER UNDER THE 60S DECREES

The water court's opinion that the number of acres irrigated with Priority 12 water does "not address the basic questions regarding Golden's entitlement under the present decree, or the extent to which Golden has exercised its entitlement" is a conclusion of law which we review de novo. See People v. Romero, 953 P.2d 550, 555 (Colo.1998) ("The trial court's legal conclusion is subject to our de novo review."). Given our opinion in Farmers High Line Canal & Reservoir Co., as well as John's Flood I and John's Flood II, the water court's conclusion is erroneous. We emphasized the importance of determining the number of acres of lawn Golden is irrigating with Priority 12 water in our opinion in Farmers High Line Canal & Reservoir Co.:

> With respect to the appellants' third claim for relief, namely that Golden has impermissibly enlarged its use of water under the decrees at issue by increasing the total lawn acreage under irrigation, we hold that litigation of this claim is not precluded. As the water court made no findings of fact with respect to this issue, we remand for further proceedings consistent with this opinion.

975 P.2d at 192 (emphasis added). In fact, with respect to appellants' third claim for relief, we explicitly held that "Golden may not enlarge the use of its decreed rights by ... using its water to irrigate lawn acreage not anticipated at the time its change in use decree was entered." [11] 975 P.2d at 203. Our precedent, especially John's Flood I, compelled this conclusion. As we have said, "[T]he acreage under irrigation is the principal basis of measurement of the use of water in the adjudication of priorities, and use on increased acreage of necessity is evidence, although rebuttable, of increased use either in volume or time." John's Flood I, 116

Colo. at 587–88, 183 P.2d at 555; accord Williams, 938 P.2d at 523. This statement applies equally to consumptive use. Thus, in determining whether Golden has expanded its use of Priority 12 water, the water court should have considered whether Golden has irrigated a greater number of acres than Wheeler anticipated when he crafted the flow rate limitations in the 60s decrees. Because there is ample evidence in the record, both of the number of acres Wheeler assumed Golden would irrigate with the 4.66 c.f.s. of Priority 12 water and of the acres of lawn Golden is actually irrigating with its Priority 12 water, we do so in its place.

Wheeler's testimony makes clear that he assumed that the Priority 12 water transferred in the first change proceeding would be used to irrigate 138 acres of lawn. In both Mannon and Farmers High Line Canal & Reservoir Co., we acknowledged that Wheeler's calculations balancing the historical agricultural consumptive use and future municipal consumptive use of Priority 12 water were premised on this assumption. See Farmers High Line Canal & Reservoir Co., 975 P.2d at 193, 197; Mannon, 145 Colo. at 386, 360 P.2d at 421. In Mannon, we summarized this aspect of Wheeler's methodology:

> With respect to the Lee Ditch, the witness computed that the removal of 2.86 c.f.s. from the ditch would result in the drying up of the Vaughn and Mannon land plus an additional 63 acres. This result was reached by determining that 2.86 c.f.s. would irrigate 138 acres; that Vaughn and Mannon irrigated 75 acres and that the difference, 63 acres, was the number which would have to be dried up.

Mannon, 145 Colo. at 386, 360 P.2d at 421. Because Wheeler applied "the same knowledge regarding Golden's municipal use patterns" in preparing the engineering study that formed the basis of the 1964 consent decree, it follows that if 138 acres could be irrigated with the 2.86 c.f.s. transferred in the first proceeding, 87 acres, to the nearest

---

11. We also emphasized that Wheeler's engineering studies and handwritten notes from the 60s proceedings were relevant under CRE 401, 402, and 403 "insofar as these documents contain information regarding the amount of lawn acreage that Wheeler assumed in formulating the 60s decree provisions." 975 P.2d at 204 n. 19.

acre, could be irrigated with the 1.8 c.f.s. of Priority 12 water transferred in the second proceeding. Thus, under the 60s decrees Golden may irrigate no more than 225 acres with the 4.66 c.f.s. of Priority 12 water that it currently owns. We now consider whether Golden has exceeded this 225–acre limit.

At trial, Mr. Duane Helton, Petitioners' expert witness and consulting engineer, testified that the average lawn application rate in Golden during 1994 was 1.78 acre-feet per acre.[12] Golden did not rebut this evidence. The water court found that Golden diverted 866 acre-feet of Priority 12 water in 1994. As we will explain more fully below, 55%, or 476 acre-feet, of this water was applied to lawn irrigation. Thus, given a 1.78 acre-feet per acre application rate, Golden irrigated approximately 267 acres of lawn with Priority 12 water in 1994.[13] This is 42 acres more than the 225 acres Golden is entitled to irrigate under the 60s decrees. Accordingly, Golden has expanded its use of Priority 12 water by irrigating more acres of lawn than Wheeler anticipated in determining that 4.66 c.f.s. of Priority 12 water could be transferred to Golden without injury to junior appropriators.

## C. THE PERCENTAGE OF PRIORITY 12 WATER GOLDEN MAY APPLY TO LAWN IRRIGATION UNDER THE 60S DECREES

■ Golden did not then, and does not now, identify any one of its water rights for any particular use within the Golden municipal water system. Therefore, Wheeler assumed that the percentage of Priority 12 water applied to lawn irrigation would be the same as the percentage of Golden's total water usage that was applied to lawn irrigation. This assumption allowed Wheeler to predict the percentage of Priority 12 water that would be applied to lawn irrigation from the actual historic use of Golden's water supply in 1956.

In 1956, Golden used a total of 1372.8 acre-feet of water. Wheeler assumed that all the water used during the non-irrigation season, November through April, was used for household purposes. From this six-month amount, Wheeler then extrapolated the in-house use for the entire year. By subtracting the total in-house use from the total annual use, Wheeler derived the amount of water Golden applied to lawn irrigation during the six-month irrigation season in 1956. That amount was 491.4 acre-feet. 491.4 acre-feet is 36% of Golden's total annual water usage in 1956 of 1372.8 acre-feet. Thus, Wheeler testified that assuming Priority 12 water was diverted 365 days a year, 36% would be used for lawn irrigation. 491.4 acre-feet is 53% of the 932.1 acre-feet of water Golden used during the six-month irrigation season in 1956. Thus, Wheeler testified that assuming Priority 12 water was diverted continuously during the irrigation season, approximately 50% would be used for lawn irrigation. Wheeler explained that to calculate the percentage of Priority 12 water that would be applied to lawn irrigation during the irrigation season, "we assume that

---

12. Mr. Helton derived the average lawn application rate in 1994 from Exhibit G–33, which consists of two reports. The first report is "City of Golden Analysis of 1989 and 1990 Lawn Irrigation Return Flows" and the second one is entitled "City of Golden Analysis of 1995 Lawn Irrigation Return Flows." Golden was required to prepare these studies under its augmentation plan decree (Case No. 83CW361).

13. Mr. Helton concludes that Golden irrigated 300 acres of lawn in 1994. This discrepancy stems from the fact that Mr. Helton relied exclusively on exhibit J–43 to determine the amount of Priority 12 water applied to lawn irrigation in 1994 whereas we rely both on exhibit J–43 and exhibit G–155. We, like Mr. Helton and the water court take the total amount of Priority 12 water diverted in 1994 from exhibit J–43. However, unlike Mr. Helton, we calculated the percentage of this total amount that was applied to lawn irrigation from exhibit G–155. This approach is most consistent with the water court's factual finding that Gary Thompson's affidavit sets forth "the best evidence of the actual percentage of total Priority 12 diversions applied to lawn irrigation." Mr. Thompson attached exhibit G–155 to his affidavit and relied on it therein. We also note that Mr. Thompson's second affidavit explains that Golden has no specific reporting obligation with respect to its unaugmented water rights. This calls into question the applicability of the total amount of diversions reported in J–43 for 1994, which are less than the total amount of diversions reported in G–155.

the 2.86 [14] would be used 100 percent of the time if transferred. Then we went through and took actual requirements per month to be equivalent to the 2.86, and that was distributed between the domestic supply, purely domestic supply or household supply, and the irrigation supply."

Accordingly, the water court's conclusion that the testimony of W.W. Wheeler in the 1959 change proceeding established that Golden could only apply 36%, or 611 acre-feet,[15] of the water it is entitled to divert during the irrigation season to lawn irrigation is erroneous. Wheeler's testimony that, based on Golden's pattern of municipal use in 1956, 36% of the Priority 12 water transferred would be applied to lawn irrigation assumed that Golden would divert Priority 12 water continuously 365 days a year. The water court's calculation fails to account for this assumption. The 36% to which Wheeler referred in his testimony is only relevant if Golden is diverting Priority 12 water continuously throughout the year [16]; this is not the case. Golden only diverts Priority 12 water during the irrigation season, and Wheeler's calculations and testimony make clear that he concluded Golden can divert 4.66 c.f.s. of Priority 12 water continuously from May through October and apply 53% of that water to lawn irrigation without injuring junior appropriators. Thus, Golden may apply up to 53% or 900 acre-feet of the water it is entitled to divert from May 1st through October

31st to lawn irrigation.[17] We now consider whether Golden has exceeded this limit.

The water court found that the best evidence of the actual percentage of Priority 12 diversions applied to lawn irrigation is set forth in the affidavit of Golden's water expert Gary Thompson. We do not disturb this factual determination as it required the water court to assess the credibility of competing evidence presented by the parties. *Farmers Reservoir & Irrigation Co.*, 33 P.3d at 812; *see also City of Thornton v. Bijou Irrigation Co.*, 926 P.2d at 88. To calculate the percentage of Golden's water supply that is used for lawn irrigation, Thompson relied on the monthly water use data contained in Exhibit G 155 and the method described in Golden's augmentation plan (Case No. 83CW361). According to the water court, Thompson

> assumed that the average diversions for the months of December–February were applied to in-house use, only. He subtracted this monthly average from Golden's total monthly diversions for each month of the period, May through October.... The resulting differences are the volumes of water applied each to lawn irrigation and other outside uses. Dividing these differences by the total diversions, and multiplying by 100 yields the percentage of total diversions that were applied to outside use.[18]

---

**14.** Wheeler's testimony is taken from the first change proceeding in which only 2.86 c.f.s of Priority 12 water was at stake. Because, Wheeler applied "the same knowledge regarding Golden's municipal use patterns" in the preparing the engineering study that formed the basis of the 1964 consent decree, this testimony applies equally to the additional 1.8 c.f.s. transferred to Golden in the second consent decree. *Farmers High Line Canal & Reservoir Co.*, 975 P.2d at 194.

**15.** (4.66 c.f.s.) × (1.98 a.f./day/c.f.s.) × (184 days, May October) × (.036).

**16.** Notwithstanding his testimony that 36% of the Priority 12 water transferred would be applied to lawn irrigation, the record as a whole clearly indicates that Wheeler did not intend that the amount of Priority 12 water applied to lawn irrigation be calculated by taking 36% of the total amount that would be diverted if Golden was diverting 4.66 c.f.s. of Priority 12 water

continuously 365 days a year. This method fails to take into account both the seasonal variation in Golden's pattern of municipal water use and the limitation inherent in the flow rate itself. Accordingly, Wheeler's testimony explicitly disclaims this method of calculating the amount of Priority 12 water that would be applied to lawn irrigation.

**17.** (4.66) × (1.98 a.f./day/c.f.s.) × (184 days, May–October) × (.53).

**18.** Thus, the only difference between Thompson's methodology and Wheeler's is that Wheeler based in-house use from Golden's total water use from November to April whereas Thompson based in-house use upon Golden's total water use from December to February. Wheeler's affidavit states that, "Generally, these two methods result in very similar irrigation percentages."

Petitioners claim that in 1994 Golden enlarged its use of Priority 12 water by applying more Priority 12 water to lawn irrigation than Wheeler anticipated. We therefore apply Thompson's methodology as described by the water court to determine whether Golden applied more than 900 acre-feet of Priority 12 water to lawn irrigation in 1994. Golden used 2719.4 acre-feet of water during the irrigation season in 1994. Of this, according to Thompson's methodology, 55%, or 1500 acre-feet, was applied to lawn irrigation.[19] Because Golden does not identify any one of its water rights for any particular use within the Golden municipal water system, we assume that an equal percentage of the Priority 12 water diverted during the 1994 irrigation season was applied to lawn irrigation.[20] Thus, Golden applied 55% of the Priority 12 water it diverted during the 1994 irrigation season to lawn irrigation. However, the water court found that Golden only diverted 866 acre-feet of Priority 12 water in 1994 just over half of its entitlement.[21] Accordingly, Golden only applied 476 acre-feet (.55 × 866) of Priority 12 water to lawn irrigation in 1994, only about 28% of the 1698 acre-feet it is entitled to divert and 424 acre-feet less than the 900 acre-feet (.55 × 1698) it is entitled to apply to lawn irrigation in any given year. Therefore, Golden did not expand its use of Priority 12 water in 1994 by applying a greater amount than Wheeler anticipated to lawn irrigation.

## IV. CONCLUSION

Wheeler determined that 4.66 c.f.s. of Priority 12 water could be diverted and utilized by Golden continuously during the irrigation season without injury to junior appropriators so long as Golden did not use this water to irrigate more than 225 acres of lawn or apply more than 53% of this water to lawn irrigation. Because Wheeler's calculations formed the basis of the 60s decrees, we hold that *both* of these limits serve to define the permissible use Golden may make of its Priority 12 water. Thus, we hold that Golden may irrigate up to 225 acres of lawn with up to 53%, or 900 acre-feet, of its Priority 12 entitlement. In holding as we do, we are mindful of the rule that "diversions are limited to an amount sufficient for the purpose for which the appropriation was made, even though such limitation may be less than the decreed rate of diversion." *Rominiecki v. McIntyre Livestock Corp.*, 633 P.2d 1064, 1067 (Colo.1981); *accord John's Flood I*, 116 Colo. at 586, 183 P.2d at 555 ("A right to use of water for irrigation is limited in time and volume by the needs of the land and the law reads this limitation into a decree declaring that right."); *Baker v. City of Pueblo*, 87 Colo. 489, 494, 289 P. 603, 605 (1930) ("Read into every decree, regardless of its language, is the unquestioned law of this state that an owner of a water priority may use the quantity awarded only when good irrigation usage justifies it, and when the needs of the land are satisfied, the water must no longer be used by him, but must be permitted to flow uninterruptedly in the channel of the stream.").

The water court erred in concluding that whether Golden has increased the acreage of

19. To compare, applying Wheeler's methodology to Golden's 1994 water use records results in the conclusion that 54% or 1460 acre-feet of water was applied to lawn irrigation.

20. This approach is consistent with the way Golden conducts its water rights accounting. Golden's method of accounting does not distinguish how much water from Priority 12, or any of its other water rights, is applied to irrigation use. Thus, the only practical approach to calculating the amount of water diverted under a particular right that was applied to lawn irrigation is to determine the percentage of Golden's entire water supply that was applied to lawn irrigation and then apply this percentage to the total amount diverted under the right at issue. This is the method we used here.

21. The water court apparently determined the amount of Priority 12 water diverted in 1994 from Exhibit J–43. Exhibit J–43 is a letter dated December 1, 1994, written by Gary Thompson on behalf of Golden to Gray Samenfink, the District 7 water commissioner. It includes a monthly summary of the City of Golden's diversions, broken down by right, for the 1994 water year. We referred to this report in *Farmers High Line Canal & Reservoir Co.*, 975 P.2d at 196 ("[A] 1994 report which Golden provided to the State Water Commissioner ... stated that Golden diverted 865.9 acre-feet of [Priority 12] water in 1994.").

lawn it irrigates with Priority 12 water since the 60s proceedings does not pertain to Appellants' claim that Golden has expanded its use of Priority 12 water. Appellants presented unrebutted and credible evidence that Golden applies 1.78 acre-feet of water on each acre of lawn. Given this application rate, Golden irrigated approximately 267 acres of lawn with Priority 12 water. This is 42 acres more than Wheeler anticipated would be irrigated with Priority 12 water, and is therefore an expansion of use. However, Golden has never applied more than 476 acre-feet of Priority 12 water to lawn irrigation in any given year. Therefore, the water court correctly concluded that Golden has not impermissibly expanded its use of Priority 12 water by applying a greater amount of Priority 12 water to lawn irrigation than Wheeler anticipated in the 60s proceedings.

Accordingly, we affirm in part and reverse in part and remand this case to the trial court with instructions that it enter an injunction prohibiting Golden from irrigating more than 225 acres of lawn with its Priority 12 water or from applying more than 900 acre-feet of Priority 12 water to lawn irrigation.